**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| TOYA DIXON-RANDOLPH and CATHERINE PRESTIGIACOMO on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) | No. 19-cv-01422 |
| | ) | |
| v. | ) | **CLASS ACTION** |
| | ) | |
| CITY OF CHICAGO and CHICAGO PARKING METERS, LLC, | ) ) | |
| | ) | |
| Defendant. | ) | |

**SECOND AMENDED CLASS ACTION COMPLAINT**

Plaintiffs, Toya Dixon-Randolph ("Randolph") and Catherine Prestigiacomo ("Prestigiacomo"), on behalf of herself and all others similarly situated, upon personal knowledge of facts pertaining to her and information and belief as to all other matters, brings this action against Defendant City of Chicago (hereafter "City") and Defendant Chicago Parking Meters, LLC (hereafter "CPM"), challenging Defendants' operation and enforcement of the Chicago Meter System. In support thereof, Randolph alleges the following:

**INTRODUCTION**

1. This is a class action seeking damages, restitution, declaratory and injunctive relief for violations by the City of Chicago of the United States Constitution.

2. This class-action arises from the City of Chicago's unconstitutional and unjust enforcement of its parking meters. Since 2008, the City has engaged in a predatory enforcement to recoup tremendous losses incurred from its notoriously unsuccessful privatization of its parking meter system. The City's sale of its meter system to Chicago Parking Meters, LLC ("CPM") for $1.15 billion is considered the model of "worst practices" in privatization deals. Better Government Association, *Chicago's Parking Meter Deal a Lesson in 'Worst Practices'* (last visited Feb. 27, 2019), available at https://www.bettergov.org/news/chicagos-parking-meter-deal-a-lesson-in-worst-practices. It's

1

estimated that CPM will recoup its entire investment by 2020 (10 years) with another sixty-five (65) years remaining on the lease or on February 29, 2084. On November 21, 2008, unbeknownst to the public or City Counsel, the City received two (2) official bids for leasing the parking meters.

3.     On December 2, 2008, the mayor held a press conference to announce the agreement to lease the meters for seventy-five (75) years to Chicago Parking Meters, LLC, and entity and group of investors led by Morgan Stanley for an amount of One Billion One Hundred Fifty-Six Million Five Hundred Thousand Dollars. ($1,156,500, 000).

4.     On December 3, 2008, the Finance Committee Chairs called a special meeting, and Mayor Daley called for a full counsel meeting "for the sole purpose" of approving the agreement.

5.     On December 4, 2008, Alderman Scott Waguespack unveiled an analysis that the value of the meters is approximately Four Billion Dollars ($4,000,000,000).

6.     The City's decision to force drivers to bear the costs of its inequitable and unsatisfactory outcome of its financial debacle has exploited all who utilize its parking meters. Most importantly, these intemperate fines and inequitable violation assessments are particularly devastating for Chicago's low-income citizens who can least afford to pay them.

7.     This class action additionally seeks restitution for the unjust enrichment of CPM through its unlawful operation of the Meter System.

**PARTIES**

8.     Plaintiff, TOYA DIXON-RANDOLPH, is a resident of Cook County, Illinois. She was cited for parking, standing, and/or compliance violations by the City of Chicago including, but not limited to, citations for an expired meter.

9.     Plaintiff CATHERINE PRESTIGIACOMO is a resident of Cook County, Illinois. Plaintiff was cited for parking, standing, and/or compliance violations by the City of Chicago

including, but not limited to, citations for an expired meter. Plaintiff was overcharged on at least two occasions for aforementioned citations.

10.     Defendant, CITY OF CHICAGO, (City) is a Illinois Municipal Corporation.

11.     Defendant CHICAGO PARKING METERS, LLC. ("CPM") is a Delaware limited liability company with its principal office in Chicago, Illinois. CPM, via its agent LAZ Parking Chicago, LLC (hereafter "LAZ"), manages, maintains and controls the City's 36,000 metered parking spaces in accordance with a concession agreement between CPM and the City ("the Agreement").

## JURISDICTION AND VENUE

12.     This is a class action seeking damages, restitution, declaratory and injunctive relief for violations of 42 U.S.C. § 1983 by the City of Chicago.

13.     This Court has original jurisdiction over this matter pursuant to Article III of the Constitution, 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1343 (civil rights).

14.     This Court has supplemental jurisdiction over Plaintiffs' claims arising under Illinois State law, including the Illinois Constitution, pursuant to 28 U.S.C. § 1367(a).

15.     Venue is proper in the United States District Court for the Northern District of Illinois under 28 U.S.C. § 1391(b) because the events giving rise to this action occurred, in significant part, within this District and all Defendants reside or are located and/or doing business in the Northern District of Illinois.

## BACKGROUND

### Chicago Parking Meter System

16.     The City's metered parking system consists of approximately 36,000 metered parking spaces ("Meter System"), the purposes of which are allegedly to achieve parking turnover and availability which facilitates traffic management (i.e. reduces congestion), promotes local business and controls for pollution. See Chicago Parking Meter Facts Brochure, CITY OF CHICAGO (2009).

17.     In pursuit of this endeavor, the City adopted and enacted various requirements, restrictions and limitations to regulate the Meter System.  Said regulations are codified in Municipal Code of Chicago (hereafter "MCC") Section 9-64-190 through 9-64-207.

18.     The City utilizes metered parking spaces to allegedly promote parking turnover and availability through two means (1) variable performance pricing and (2) time limits.  U.S. Dept. of Trans., FHWA-HOP-12-026, *A Contemporary Approach to Parking Pricing: A Primer* 6 (2012).

19.     Variable performance pricing utilizes meter fees to incentivize parkers to spend less time in a parking space. When a fee is associated with use of the space, the thought is parkers will use less time to avoid paying for an additional period where the cost outweighs the need for the space. Where however, the necessity for the space outweighs the cost associated with the meter, parkers may pay additional fees to continue use of the space for an extended time. Id.

20.     The City has codified this incentive-based policy in Section 9-64-205 and 9-64-207 of the MCC.

21.     Section 9-64-205 of the MCC establishes a variable pricing scheme for the Meter System and rates vary based on the meter's location or "zone."

22.     Meter prices for Chicago Neighborhoods (area outside the downtown area bounded by Roosevelt Avenue to the south, North Avenue to the north and Halsted Street to the west), and most rates are **$2 per hour ($.03 per minute)** from 8:00 a.m. to 10:00 p.m.

23.     In the Central Business District outside the Loop (area bounded by Lake Michigan to the east, North Avenue to the north, Halsted to the west, and Roosevelt Road to the south), rates are **$4 per hour ($.06 per minute)** from 8:00 a.m. to midnight.

24.     In the Central Business District inside the Loop (area bounded by Lake Michigan to the east, Wacker Drive to the north and west, and Congress Parkway to the south), rates are **$6.50 per hour ($.11 per minute)** from 8:00 a.m. to 9:00 p.m. and **$3.25 per hour ($.05 per minute)** from 9:00 p.m. to 8:00 a.m.

4

25.     Pursuant to Section 9-64-207 of the MCC, an individual may purchase any one-minute increment of time between the Zone Maximum and (a) 20 minutes if using the pay box at any meter location or (b) 15 minutes or 30 minutes when using the ParkChicago application depending on the meter location.

26.     Conversely, the City allegedly relies on parking time limits to force turnover in the instances where its pricing policy fails to achieve its desired turnover rate. Rather than allowing an individual to decide to continuously bare the cost of the meter in exchange for use of the space (essentially monopolizing the space), **maximum parking durations (mostly 2 or 3 hours)** are established to force turnover. Once the time limit expires the vehicle is required to be removed lest the driver be fined.

27.     These time limits are codified at Section 9-64-207 of the Municipal Code of Chicago. In the MCC, the City has established a maximum period of time for certain zones in the Meter System either through ordinance or by the Comptroller ("Zone Maximums"). A meter's limit is posted on the meter and indicated within the mobile pay application, ParkChicago App.

28.     Use of the Meter System is regulated under MCC Section 9-64-190.

29.     Under MCC Section 9-62-190, it's unlawful to park in a designated metered parking space or zone without paying for its use.

30.     Pursuant to MCC Section 9-64-190, "{e}xcept as provided in Section 9-64-10(c)(1) and subject to Section 9-64-207, upon the expiration of the time thus designated by the meter, or on the ticket, token, display device or electronic receipt, the **operator** of the motor vehicle **shall** then **immediately remove** such **vehicle** form the parking meter zone. **No operator** of any motor vehicle **shall permit such vehicle** to **remain** in the parking meter zone for an **additional consecutive time period**."

31.     Allegedly**,** these requirements serve to promote the voluntary turnover plan implemented by the City in MCC Section 9-64-205 and Section 9-64-207.

32.     These meter use requirements are enforced via an expired meter fine defined in the schedule of parking, standing, and compliance fines established in MCC Section 9-100-020.

**Sale of the Meter System**

33.     In 2010, the City of Chicago entered into a private concession agreement with CPM.  The terms grant CPM the exclusive right to operate the Meter System for a seventy-five (75) year term for a one-time payment to the City of $1.15 billion.

34.     Under the Concession, CPM has the exclusive right to collect and retain all revenue from the Meter System. Accordingly, for the term of the Concession, the City will not receive any revenue derived from the Meter System.

35.     Pursuant to the Concession Section 1.11 "**Laws. Unless specified otherwise, references to a Law are considered to be a reference to (i) such Law as it may be amended from time to time, (ii) all regulations and rule pertaining to or promulgated pursuant to such Law, (iii) the successor to the Law resulting from recodification or similar reorganizing f Laws and (iv) all future Law pertaining to the same or similar subject matter. Nothing in this Agreement shall fetter or otherwise interfere with the right and authority of the City to enact, administer, apply and enforce any Law.**" Further, Section 1.16 Enactment, Administration, Application and Enforcement of Laws by the City states "**{n}othing in this Agreement shall fetter or otherwise interfere with the right and authority of the City to enact, administer, apply and enforce any Law** . . ."

36.     Additionally, per the terms of the Concession, the City is responsible for enforcing meter violations and maintains the right to all funds generated through enforcement of the meters (i.e. fines, penalties, and other amounts in connection with the violation).

37.    CPM however, is also authorized by the City to enforce the Meter System, at CPM's own expense, through issuance of expired meter parking tickets. The tickets issued by CPM have the same legal efficacy as parking tickets issued by the City.

38.    Based on the latest (2017) financial report by KPMG, CPM **is anticipated to recoup the full $1.15 billion investment by 2021** with several years remaining to earn revenue to the City's potential loss of $5 billion dollars for its inept evaluation of the initial lease agreement.

39.    Moreover, under the Concession, the City is obligated to **pay CPM** "true up payments" to reimburse CPM investors for every space that becomes unavailable for any reason. Id.

40.    Upon information and belief, in 2017, the City paid CPM $21.7 million in "true up payments" with additional fees owed to CPM pursuant to lease agreement where meters are taken out of use for parades, events construction, etc.  Id. It's estimated the total cost of and payments made to Concession could be $1 billion dollars.

41.    Accordingly, not only has the City lost a significant source of revenue through the sale of the Meter System, it has incurred an increased and escalating financial obligation to CPM for which Chicago taxpayers and all parkers (domestic residence, businesses, and tourists) are forced to bear the cost.

42.    As a result, the Concession has been heavily criticized and is deemed by many critics and municipal leaders as a "lesson in worst practices" for municipal privatization deals. *See Chicago's Parking Meter Deal a Lesson in 'Worst Practices'*, BETTER GOVERNMENT ASSOCIATION, (Nov. 16, 2010), *see also* Pam Zekman, *2 Investigators: More Evidence Of A Bad Parking Meter Deal*, CBS CHICAGO (June 14, 2017), https://chicago.cbslocal.com/2017/06/14/chicago-bad-parking-meter-deal/. Moreover, current Mayor Rahm Emmanuel who "inherited" this situation has on numerous occasions been vocal that the lease agreement was an unfortunate event that he would not have proposed, even recently suggesting that the new 7 year proposed Lyft deal will not remotely be compared to the financial outcome of the previous meter lease.

**Enforcement of Meter System**

43.    Under the Concession, the City is entitled to all of the revenue generated via enforcement of the Meter System.

44.    Parking meter enforcement is undertaken by:

(1)  City of Chicago Department of Finance ("beat" police officers),

(2)  Serco, Inc. (agent for City to issue various types of tickets from meter fines, expired plates, City stickers, etc.),

(3)  LAZ Parking Chicago, LLC (agent for CPM whose sole responsibility is meter fines).

45.    The City abuses its police powers to force parkers to bear the costs of its appalling and misguided fiasco through the assessment and collection of unconstitutionally excessive fines that bare no rational relationship to the minor infraction of a meter overstay infraction and overcharging unsuspecting motorists for the sole purpose of generating revenue.

*The City's Use of Excessive Fines.*

46.    The regulations set forth in 9-64-190 are enforced by the issuance of a fine, the amount of which is specified in the parking, standing, and vehicle compliance schedule of fines.

47.    This enforcement scheme is highly inequitable. It excessively fines one who underestimates the duration of their stay **affording no opportunity to rectify or mitigate the minor infraction**.

48.    In 2018, the fine for an expired meter in a non-central business district is $50.00. Municipal Code 9-64-190(a). The fine for an expired meter in a central business district is $65.00. Municipal Code 9-65-190(b). Conversely the fines for driving with faulty headlights/taillights, without a rearview mirror, without a seatbelt, with a projecting load – all of which serve the vital function of ensuring driver and public safety – are only $25. (Chicago Parking Enforcement Code)

49.    Upon information and belief, the City's alleged intent in enforcing meters through the issuance of parking tickets is to increase revenue, promote compliance with the Meter System and

punish scofflaws. However, in reality the "real" intent is to generate maximum revenue to recoup of tremendous loses from the privatization lease agreement.

50.   The revenue generated from the expired meter fine however, is intended to maximize revenue generation.

51.   The fine is assessed regardless of how long the driver has overstayed (i.e. 1 sec., 1 minute, 10 minutes, or 1 hour all subjects an individual to the same fine) and without consideration of the driver's previous payments to the meter.

52.   The second the meter expires you are subject to the fine.

53.   Accordingly, **a driver who has paid repeatedly to extend their meter time and remain compliant, is still susceptible to the excessively disproportionate and unjust punishment of $50/$65 fine if they mistakenly allow their meter to expire.** (Tickets can be issued **every** two hours after the first citation if the vehicle is beyond the 2/3 maximum assuming the vehicle is not moved.)

54.   For those in low-income and predominantly African American and Hispanic communities, the cost is not only excessive, it's devasting; failure to pay the exorbitant fine results in a late fee equal to the original fine doubling the driver's liability to the City.

55.   Furthermore, upon information and belief, this accumulation of debt can result in a crippling ripple effect for low-income citizens. These fines have the effect of depriving many in disadvantaged communities of their livelihood.

56.   Upon information and belief, nonpayment of the meter fines can result in license suspension, vehicle immobilization, restricted access to required licenses to do business in the City, and even diminished access to grants and funding earmarked for low-income communities.

57.   These consequences have the effect of trapping low-income individuals in an inescapable cycle of debt and poverty by depriving them of the very means they need to escape.

58.   As a result of the City's predatory parking enforcement practices, many of Chicago's most vulnerable citizens have been driven to bankruptcy as their only recourse to crushing parking ticket

debt. *See* Melissa Sanchez and Sandhya Kambhampati, *How Chicago Ticket Debt Sends Black Motorists Into Bankruptcy*, PROPUBLICA ILLINOIS (February 27, 2018). https://features.propublica.org/driven-into-debt/chicago-ticket-debt-bankruptcy/.

59.     The inequity is absolutely unconscionable when weighed against the nominal cost the driver would have paid to extend the time (as little as 3 cents per minute and at most, 11 cents per minute) against the $50/$65 fine.

60.     **As an example, for a motorist parked in a Chicago Neighborhood who has paid but overstays as little as five minutes, the ratio of the fine compared to the amount cost to continue use of the same space is nearly 300:1.**

      **a.** For those who parked in the Central Business District outside the Loop, the ratio is nearly **195:1**.

      **b.** For those who parked in the Central Business inside the Loop between 8:00 a.m. – 9:00 p.m., **the ratio is 120:1**.

      **c.** For those who parked in the inside the Loop between 9:00 p.m. – 8:00 a.m., **the ratio is 240:1**.

61.     Additionally, drivers are not afforded the opportunity to rectify or "mitigate their damages" by retroactively paying for the time they overstayed.

62.     While an individual is permitted to extend their parking session by purchasing "additional time" to the meter expiring to remain in compliance, immediately upon expiration said opportunity is no longer afforded either through an app or meter.  In other words, any opportunity to mitigate, correct or rectify the issue is prohibited with the use of the same technology that is afforded to grant or extend additional time to park. (Example: a *pro rata* fine determined by the time multiplied by the rate per hour, plus a *de minimis* administrative fee.)

63.     The City does not recognize as grounds for contesting an expired meter violations (i) correcting the violation prior to adjudication of the charge (i.e. adding extended time to the meter

within limited period following expiration of the meter) or (ii) receipt of ticket within 5 minutes of meter expiration except for tickets issued prior to April 1, 2011.

64.     Recognizable grounds for contesting an expired meter violation include:

    a)  Respondent was not the owner or lessee of the cited vehicle at the time of the violation;

    b)  The cited vehicle or its state registration plates were stolen at the time the violation occurred;

    c)  The relevant signs prohibiting or restricting parking or standing were missing or obscured;

    d)  The relevant parking meter was inoperable or malfunctioned through no fault of the respondent;

    e)  That the facts alleged in the violation notice are inconsistent or do not support a finding that the specified regulation was violated.

65.     From **January 1, 2010 to April 1, 2011**, however, the City **recognized receipt of an expired meter violation within five minutes of meter expiration as a ground for contesting the ticket**. Upon information and belief, **one of the purposes** for establishing this grace period was to **protect law-abiding individuals who accidently overstayed their meter time despite attempting to comply with the regulations by paying for the meter time. This grace period was extinguished on April 1, 2011 (Sunshine Law).**

### *The City's Overcharging of Unsuspecting Drivers.*

66.     In addition to abusing its police powers to assess unconstitutionally excessive expired meter fines, the City preys on unsuspecting tourists, visitors and even Chicago locals by overcharging motorists in non-Central Business Districts through the imposition of unlawful $65 fines. *See* Dorothy Tucker, *City Overcharging for Thousands Of Expired Meter Parking Tickets*, CBS CHICAGO (May 14, 2019).                    https://chicago.cbslocal.com/2019/05/14/expired-parking-meter-tickets-overbilled-overcharged/.

67.     Upon information and belief, "from 2013 to 2018 the city issued 30,001 parking tickets outside the central business district at the $65 rate, resulting in a cumulative overcharge of more than $450,000." Id.

68.     "Motorists parking along Solidarity Drive on the Museum Campus [a Non-Central Business District] received the most [overcharge] tickets during that time. Business district tickets also were issued at O'Hare International Airport, and as far south as the Roseland neighborhood." Id.

69.     Upon information and belief, the City engaged in this practice of overcharging prior to 2013. Id.

70.     Because the City's assessment of $65 fines in Non-Central Business District is in direct conflict with its schedule of fines in Section 9-64-190, those tickets are unconstitutional on their face.

**The Chicago Skyway**

71.     Upon information and belief, the Chicago Skyway is a toll system that utilizes variable rate pricing, the purpose of which is nearly identical to that of metered parking, e.g. facilitating traffic to reduce congestion.

72.     Use of the Skyway is regulated by MCC section 9-12-030.

73.     Similar to the Meter System, it's unlawful for a driver to use a toll highway that requires the payment of a predetermined toll without payment of the required fee(s). This provision is enforced by a fine of $25. *See* MCC Section 9-12-030.

74.     Accordingly, the enforcement of the payment requirement of $25 is significantly less than the $65 fine imposed for a meter violation. The fine is imposed whether by disregard of payment, mistake, lack of funds, etc.

75.     Notably, the tollway fine is referred to as a collection service fee on the public Skyway website rather than as fine as it is in the MCC and under the Meter System.

76.     Additionally, before the $25 fine is assessed toll violators are provided an opportunity to first pay the missed toll payment within 7-days of the violation, during which period no additional fees

are assessed for the related violation, regardless of whether the non-payment was intentional or inadvertent.

77.    It is not until 7-days have passed that the $25 fine is assessed in addition to the missed toll fee, at which point the "user" either "intentionally or unintentionally" fails to pay the toll and is thus punished accordingly through the assessment of the fine.

**Plaintiff Facts**

**Randolph**

***Non-Central Business District Expired Meter Ticket.***

78.    On or about April 15, 2015, Randolph parked in a meter zone within the non-central business district.

79.    Randolph paid for the meter using the ParkChicago mobile app.

80.    The time Randolph paid to use the meter space was below the Zone Maximum.

81.    Randolph overstayed her meter time.

82.    On or about April 15, 2015, Randolph was issued an expired meter parking ticket in a non-Central Business zone with a fine of $50.

83.    Randolph paid the fine.

***Non-Central Business District Expired Meter Ticket.***

84.    On or about November 21, 2016, Randolph parked in a meter zone within the central business district.

85.    Randolph paid for the meter using the ParkChicago mobile app.

86.    The time Randolph paid to use the meter space was below the Zone Maximum.

87.    Randolph overstayed her meter time.

88.    On or about November 21, 2016, Randolph was issued an expired meter parking ticket in a Central Business zone with a fine of $65.

**Prestigiacomo**

89. **On or about November 9, 2015, Prestigiacomo parked in a meter zone located in a non-Central Business District.**

90. **Prestigiacomo paid to use the meter space.**

91. **Prestigiacomo overstayed the meter time.**

92. **Upon information and belief, on or about November 9, 2015, Prestigiacomo was issued an expired meter parking ticket for $65.**

93. **Prestigiacomo paid the full price designated on the expired meter ticket.**

<u>**CLASS ACTION ALLEGATION**</u>

94. This action is brought as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), on behalf of Plaintiff and a class of similarly situated individuals defined as follows:

> All persons who were assessed and/or paid the penalties under the Schedule for parking at an unpaid or expired meter described above from 2010 onward (the "Class").

95. Plaintiff also seek to represent the sub-classes defined as follows:

> All persons who were assessed and/or paid an expired parking meter fine representing a triple digit-multiplier of the actual cost for the meter overstay period ("Multiplier Sub-Class").

> All persons who paid via the ParkChicago App to extend their meter time past the Zone Maximum. (Extension Sub-Class).

> All persons who were assessed and/or paid an expired meter ticket at the Central Business District rate while parked in a Non-Central Business District. (Overcharge Sub-Class).

96. The proposed Class satisfies the numerosity, commonality, typicality, and adequacy requirements of those provisions.

97. While the total number of members of the proposed Class are unknown they are so numerous that joinder of all members is impractical. The exact number of members of the Class can only be determined through discovery because this information is located in records maintained by and

14

in the exclusive control of Defendant and/or its agents. Upon information and belief, Plaintiff reasonably believes the Class will contain numbers well into the thousands.

98.     Additionally, there is a well-defined community of interest in the questions of law and fact involving this case. The relief sought is common to all Class members and common questions of law and fact exist as to the Class that will predominate over questions if any, that affect only individual Class members. Common questions include:

> a) Whether parking fines assessed by the City at the exact moment a meter expires or shortly thereafter constitute "excessive fines" under the United States Constitution or a disproportionate penalty under the Illinois Constitution;
>
> b)  the appropriate equitable relief;
>
> c) whether the City should refund the payments (either in full or in part) it collected;
>
> d  whether unpaid fees assessed against Class members should be forgiven;
>
> e) whether the City should be enjoined from further collection of unconstitutional fines and related penalties;
>
> f) other relief is granted by this court.

99.     The claims asserted by the class representative plaintiff are typical of the claims of the members the Class Plaintiff seeks to represent. All Class members have been assessed and/or paid the unconstitutional parking fines and were subjected to the predatory parking collection and enforcement Defendant City of Chicago has implemented, maintained and enforced. The answers to the common questions of law and fact raised by Defendant's actions will determine the claims of the named plaintiff and other Class members.

100.    These common questions arise from the City's consistent assessment of fines and penalties under their unlawful and predatory parking ticket collection and enforcement practice it has instituted. Accordingly, the Defendant's actions are generally applicable to all Class members thereby making declaratory judgment and injunctive relief appropriate with respect to the class as a whole.

101. There are no known conflicts of interest among Class members. All Class members were assessed an unconstitutional and unlawful expired meter fine and thus share an interest in vindicating and protecting their rights, recovering unlawfully collected payments made to Defendant under the parking scheme.

102. Additionally, Plaintiff, as Class representative and a member of the Class, will fairly and adequately protect the interests of the Class by vigorously pursuing this suit through attorneys experienced in litigation and trial.

103. A class action is superior to other available methods for fairly and efficiently adjudicating the controversy for the reasons as follows.

104. Resolution of the claims on a Class-wide basis will (i) enable the cost-effective litigation of this matter in comparison to repetitive individual litigation and (ii) prevent the unnecessary expenditure of individual resources through repetitive litigation of the same claims, the economic benefits of which will inure to the Court and the parties.

105. Adjudication of the claims on an individual basis is not an economically viable option for many Class members due to the relatively small size of most individual's damages claims.

106. Most Class members lack the ability to prosecute individual actions due to a lack of financial resources and the complexity of the issues thereby preventing them from receiving legal representation or the redress owed to them for their injuries.

107. Because only select Class members have the ability to pursue prosecution of their claims, class treatment is required to (i) effectively deter Defendant from continuing their unlawful conduct, (ii) ensure Defendant is unable to retain millions of dollars in unjustly and unlawfully obtained funds, and (iii) effectively remedy and correct Defendant's unlawful and unfair conduct.

108. No unusual difficulties are anticipated in the management of this class action.

109. Plaintiff further requests this Honorable Court to appoint Plaintiff's Attorneys Patrick Dowd and Edward Clinton as Class Counsel and for class certification.

16

## COUNT I

### City of Chicago

### Relief Under Of 42 U.S.C. § 1983 for Unconstitutional Fines Under the Eighth Amendment.
(by Plaintiffs and proposed Class)

110.   Plaintiffs reallege and incorporate by reference Paragraphs (1) to (109) of this Complaint as is stated fully herein.

111.   Plaintiffs and members of the proposed class have been prosecuted for a violation of MCC 9-64-190.

112.   Plaintiffs and members of the proposed class have paid and/or are liable to pay the associated fine(s) for said violation as set forth in MCC 9-100-020.

113.   These fines are civil sanctions that are punitive in nature.  They have the purposes of ensuring compliance with 9-64-190 and punishing scofflaws. Accordingly, the fines include retributive and deterrent elements.

114.   The Eighth Amendment to the United States Constitution protects individuals from excessive fines.

115.   Plaintiffs and members of the proposed class have a right not to have excessive fines imposed against them.

116.   A parking violation fine of $65 in a central business district is grossly disproportionate to the nature of the offense given the proportionality of the fine to the actual damages caused.

117.   A parking violation fine of $50 in a non-central business district is grossly disproportionate to the nature of the offense given the disproportionality of the fine to the damages caused.

118.   The protection of the Eighth Amendment applies to state municipalities. (*See* Timbs v. Indiana, 2019 U.S. LEXIS 1350 * | __ S.Ct. __ | 2019 WL 691578).

119.    By the facts and actions described heretofore, Defendant City of Chicago and their official parking meter policy has an unconstitutional policy of imposing and collecting excessive fines upon Plaintiffs and members of the proposed Class.

120.    Defendant City of Chicago passed ordinances, **9-64-190** and **9-100-020**, to establish and enforce a schedule of fines for expired meter violations.

121.    Defendant City of Chicago's municipal policy is the moving force behind the violation of Plaintiffs and proposed Class members right to be free from excessive fines as it provides the basis and authorization for the imposition of the unconstitutional fines.

122.    Defendant City's enforcement of its parking meter policy through the imposition of grossly disproportionate penalties has deprived motorists of their right to be free from excessive fines.

123.    Defendant City has violated and continues to violate the right of Plaintiffs and the members of the proposed class protected by the Eighth Amendment to the United States Constitution and 42 U.S.C. § 1983.

124.    Defendant's actions have directly and proximately caused Plaintiffs and Class members immediate, irreparable harm, including but not limited to loss of money.

WHEREFORE, Plaintiff prays that the Court:

A.      Declare that the City's expired meter parking violation fines are unconstitutionally excessive and unenforceable, and, therefore, that any liability and any fines, penalties or other amounts stemming from any such violations are void *ab initio* and unenforceable, that Plaintiff and Class members need not pay outstanding fines, penalties or other amounts stemming from any such violations, and that Plaintiffs and Class members are entitled to restitution of them if they were paid;

B.      Issue an order for Defendant to cease enforcement and prosecutions under such statute;

C.      Grant an award of reasonable attorneys' fees and all expenses and costs of this action;

D.      Order such other and further relief as this Court deems equitable, just and proper; and

E.     Award Plaintiffs and class members damages in excess of 15 million dollars or in an amount to be determined according to proof.

## COUNT II

### City of Chicago

**Relief Under Of 42 U.S.C. § 1983 for Unconstitutional Fines Under the Eighth Amendment.**
(by individual and proposed Multiplier Sub-Class)

125.   Plaintiffs reallege and incorporate by reference Paragraphs (1) to (124) of this Complaint as is stated fully herein.

126.   Plaintiffs and members of the proposed Multiplier Sub-Class paid to park at a parking meter in the City of Chicago.

127.   Plaintiffs and members of the proposed Multiplier Sub-Class subsequently overstayed the meter time for which payment was made.

128.   Plaintiffs and members of the proposed Multiplier Sub-Class have been prosecuted for a violation of MCC9-64-190.

129.   Plaintiffs and members of the proposed Multiplier Sub-Class have paid and/or are liable to pay the associated fine(s) for said violation as set forth in MCC 9-100-020.

130.   The ratio of the fines assessed against Plaintiffs and members of the proposed Multiplier Sub-Class to the price of the overstay period are more than or equal to 100:1.

131.   These fines are civil sanctions but are punitive in nature.  They have the purpose of ensuring compliance with 9-64-190 and punishing scofflaws. Accordingly, the fines include retributive and deterrent elements.

132.   The Eighth Amendment to the United States Constitution protects individuals from excessive fines and forfeitures.

133.   Plaintiffs and members of the proposed Multiplier Sub-Class have a right not to have excessive fines imposed against them.

134. The expired meter fines established and imposed under MCC 9-100-20 are unconstitutionally excessive as applied to Plaintiffs and proposed members of Multiplier Sub-Class.

135. An expired meter fine with a ratio of 100:1 or higher to the damage incurred is grossly disproportionate to the nature of the offense, minor parking violations, given the disproportionality of the fine to the damages caused.

136. The protection of the Eighth Amendment applies to state municipalities. (*See* Timbs v. Indiana, 2019 U.S. LEXIS 1350 * | __ S.Ct. __ | 2019 WL 691578).

137. By the facts and actions described above regarding the City's official parking meter policy, Defendant City of Chicago had and has an unconstitutional policy of imposing and collecting excessive fines upon Plaintiffs and members of the proposed Multiplier Sub-class 1.

138. Defendant City of Chicago passed ordinances, 9-64-190 and 9-100-020, to establish and enforce a schedule of fines for expired meter violations.

139. Defendant City of Chicago's municipal policy is the moving force behind the violation of Plaintiffs' and proposed Multiplier Sub-Class members' right to be free from excessive fines as it provides the basis and authorization for the imposition of the unconstitutional fines.

140. The City's enforcement of its parking meter policies through the imposition of grossly disproportionate penalties has deprived motorists of their right to be free from excessive fines.

141. Defendant City of Chicago has violated and continues to violate the right of Plaintiffs and the members of the proposed Multiplier Sub-Class protected by the Eighth Amendment to the United States Constitution and 42 U.S.C. § 1983.

142. Defendant's actions have directly and proximately caused Plaintiffs and proposed Multiplier Sub-Class members immediate and irreparable harm, including but not limited to loss of money.

WHEREFORE, Plaintiffs pray that the Court:

A.      Declare that the City's expired meter parking violation fines as applied to Multiplier Sub-Class members are unconstitutionally excessive and unenforceable,  and, therefore, that any liability and any fines, penalties or other amounts stemming from any such violations are void ab initio and unenforceable, that Plaintiffs and Multiplier Sub-Class members need not pay outstanding fines, penalties or other amounts stemming from any such violations, and that Plaintiffs and Multiplier Sub-Class members are entitled to restitution of them if they were paid;

B.      Issue an order for Defendant to cease enforcement and prosecutions under such statute;

C.      Grant an award of reasonable attorneys' fees and all expenses and costs of this action;

D.      Order such other and further relief as this Court deems equitable, just and proper; and

E.      Award Plaintiffs and Multiplier Sub-class members damages in excess of 15 million dollars or in an amount to be determined according to proof.

## COUNT III

### City of Chicago

### Relief Under Of 42 U.S.C. § 1983 for Violation of Rights Secured by The Equal Protection Clause of The Fourteenth Amendment.
(by individual and proposed Class)

143.   Plaintiffs reallege and incorporate by reference Paragraphs (1) to (142) of this Complaint as is stated fully herein.

144.   The protection of the Fourteenth Amendment applies against state municipalities.

145.   Defendant City of Chicago has custom and practice of allowing toll road violators an opportunity to cure their violation before a penalty is assessed.

146.   This custom and practice, which is readily available on the Chicago Skyway website, is so well settled and widespread that the policymaking officials of the City can be said to have either actual or constructive knowledge of said policy.

147. Having actual or constructive knowledge of this custom and practice, the City has done nothing to end this predatory practice.

148. The aforementioned custom and practice is a policy of Defendant City of Chicago having the force of law.

149. Plaintiffs and proposed Class members were and are similarly situated to drivers who are remiss to pay for use of the Chicago Skyway at the time of use thereof.

150. Nevertheless, the City does not afford Plaintiffs and proposed Class members the same opportunity to cure, rectify or mitigate the failure to pay violation.

151. Defendant's policy of providing toll road violators an opportunity to rectify a violation before imposition of a penalty, but not affording Plaintiffs and proposed Class members the same opportunity, deprives Plaintiffs and proposed Class members of rights secured by Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

152. Plaintiffs and Class members have suffered and will suffer damages, including but not limited to, loss of money as a direct and proximate result of the City's constitutional violations.

153. The City is liable under a municipal liability for these violations.

WHEREFORE, Plaintiffs pray that the Court:

A.    Declare that the lack of any opportunity to cure, rectify or mitigate the failure to pay meter violation unconstitutionally deprives Plaintiffs and Class members of their Fourteenth Amendment right to equal protection of the law and therefore that any liability and any fines, penalties or other amounts stemming from any such violations are void ab initio and unenforceable,  and that Plaintiffs and Class  members need not pay outstanding fines in excess of the amount charged for the overstay period at the meter and/or are entitled to restitution of the excess of said amount if they were paid;

B.    Issue and order prohibiting the City from discriminatorily enforcing its Meter policy in violation of the Fourteenth Amendment;

C.     Grant an award of reasonable attorneys' fees and all expenses and costs of this action;

D.     Order such other and further relief as this Court deems equitable, just and proper; and

E.     Award Plaintiffs and Class members damages in excess of 15 million dollars or in an amount to be determined according to proof.

## COUNT IV

### City of Chicago

**Relief Under Of 42 U.S.C. § 1983 for Deprivation of Due Process in Violation the Fourteenth Amendment.**
(by individual and proposed Class)

154.   Plaintiffs reallege and incorporate by reference Paragraphs (1) to (152) of this Complaint as is stated fully herein.

155.   The Fourteenth Amendment to the United States Constitution, section 1, prohibits any State from depriving any person of life, liberty, or property without due process of law.

156.   The protection of the Fourteenth Amendment applies against state municipalities.

157.   The Defendant's excessive penalties scheme and their enforcement thereof, as above alleged, have deprived Plaintiffs and members of the proposed Class of property in violation of due process.

158.   The Defendant's unconstitutionally unequal treatment of Plaintiffs and proposed Class members with similarly situated toll violators, has deprived and continues to deprive Plaintiffs and Class members of property in violation of due process.

159.   The Defendant's enforcement and adjudication policy of parking meter violations does not allow alleged violators to cure the violation through retroactive payment for use of a meter space under or up to the meter maximum.

160.   The lack of an opportunity to cure, rectify or mitigate deprives Plaintiffs and proposed Class members of property in violation of due process.

WHEREFORE, Plaintiffs pray that the Court:

A.  Declare that the Defendant's parking meter enforcement and adjudication policy unconstitutionally deprives Plaintiffs and Class members of their Fourteenth Amendment right to due process and therefore that any liability and any fines, penalties or other amounts stemming from any such violations are void ab initio and unenforceable, that Plaintiffs and Class members need not pay outstanding fines in excess of the amount charged for the overstay period at the meter, and that Plaintiffs and Class members are entitled to restitution of the excess of said amount if they were paid;

B.  Issue an order prohibiting the City from discriminatorily enforcing its Meter policy in violation of the Fourteenth Amendment;

C.  Grant an award of reasonable attorneys' fees and all expenses and costs of this action;

D.  Order such other and further relief as this Court deems equitable, just and proper; and

E.  Award Plaintiffs and Class members damages in excess of 15 million dollars or in an amount to be determined according to proof.

## COUNT V

### CPM

**Unjust Enrichment on Behalf of Extension Sub-Class**

161.  Plaintiffs adopt and incorporates by reference paragraphs (1) through (160) as if fully stated herein.

162.  Section 9-64-207 of the MCC authorizes the establishment of Zone Maximums within the Meter System.

163.  Section 9-64-190 permits drivers to use the Meter System subject to the Zone Maximums established pursuant to 9-64-207.

164.  It is the official policy of the City that extending meter time past the **Zone Maximum is a violation** of ordinance (law) 9-64-190 and 9-64-207 subject to the expired meter fine.

165.   At all times relevant, CPM knew or should have known of MCC Sections 9-64-190 and 9-64-207, which prohibits the practice of any extension beyond the established maximum posted meter time.

166.   CPM is required under the 2013 Concession Agreement (lease) to operate the meter system in compliance with the laws of the City of Chicago including the ordinances codified in the MCC, specifically those contained within Sec. 9-64 and the rules, policies of the City.

167.   CPM designed, purchased, controls and maintains the ParkChicago App. Meters and hardware/software technology to both.

168.   CPM's ParkChicago App unlawfully permits users to extend parking time without movement of the vehicle past the Zone Maximum upon payment of additional fee.

169.   Accordingly, CPM has received or obtained revenue for unlawful meter extensions past the designated Zone Maximums in direct conflict with the (law) City ordinance 9-64-190

170.   Extension Sub-Class Members have paid CPM monies via the extension feature in the ParkChicago App to extend the meter time past the respective Zone Maximum in violation of the (law) City. The City has authority pursuant to said ordinance to issue fines even when time remains on a meter extended by CPM. Notwithstanding , CPM has collected revenue at the peril of a parker exposed to receiving a ticket.

171.   The City has issued tickets and collected fines from individuals who were allowed by CPM to extend time on a meter pursuant to City ordinance 9-64-190.

172.   Accordingly, CPM has collected from Plaintiff and Extension Sub-Class members monies and properties to which it is not entitled. The City knowingly appreciated and accepted this benefit, which has and continues to result in an inequity to Plaintiff and Extension Sub-class members.

173.   Every minute an Extension Sub-Class member pays or has paid CPM to extend past the meter maximum, he or she is/was placed unwittingly in peril of receiving a $50/$65 expired meter ticket. CPM profits from illegal meter extensions at the expense of parkers.

174.   It is inequitable for Defendant CPM to retain the funds obtained from unlawful meter extensions via its ParkChicago App.

175.   Under equitable principles, CPM should be required to disgorge any amount unlawfully and unfairly collected from Plaintiff and Extension Sub-Class members.

176.   Defendant is unjustly enriched by charging a "convenience" fee of $.35 on parkers who request a shorter time limit.

177.   Defendant is unjustly enriched by generating revenue from individuals "account balances" for those using the Chicago parking app.

178.   Defendant is not entitled to governmental immunity.

WHEREFORE, Plaintiff prays that the Court:

A.   Award Plaintiffs and Class members damages in excess of 100 million dollars or in an amount to be determined according to proof;

B.   Grant an award of reasonable attorneys' fees and all expenses and costs of this action; and

C.   Order such other and further relief as this Court deems equitable, just and proper.

## COUNT VI

### City of Chicago

### Unjust Enrichment on Behalf of Overcharge Sub-Class

179.   Plaintiffs adopt and incorporate by reference paragraphs (1) through (178) as if fully stated herein.

180.   The City has implemented a practice, policy, and custom of issuing and enforcing unlawful expired meter tickets against unsuspecting motorists in its continued effort to generate revenue with no regard for the law.

181.   Section 9-64-190 establishes the schedule of fines to be assessed for a myriad of parking, standing and vehicle compliance violations.

182. Under Section 9-64-190 an expired meter violation in a non-Central Business District is $50.

183. Nevertheless, Defendant City of Chicago has a practice and custom of issuing and collecting on tickets in various Non-Central Business Districts at the higher Central Business District rate of $65.

184. Consequentially, the City is assessing and collecting upon unlawfully issued tickets that require payment of unlawfully assessed fines. These tickets are therefore void ab initio.

185. Plaintiff Prestigiacomo and members of the proposed Overcharge Sub-Class have paid the full $65 rate unlawfully designated on the invalid tickets.

186. Accordingly, Prestigiacomo and members of the proposed Overcharge Sub-Class have paid $15 in excess of the designated fine for an expired meter violation in a Non-Central Business District for each unlawfully issued ticket they have received and paid.

187. The City has not reimbursed Plaintiff Prestigiacomo or members of the proposed Overcharge Sub-Class for any of the monies received in excess of the designated $50 rate for the Non-Central Business District tickets.

188. It is inequitable for the City to retain the excess funds received from these unlawfully assessed overcharge tickets.

189. Under equitable principles, the City should be required to disgorge any amount unlawfully and unfairly collected from Prestigiacomo and Overcharge Sub-Class members.

190. The City is unjustly enriched by charging a $15 than the fine designated in Section 9-64-190 of the MCC for a Non-Central Business District expired meter violation.

191. The City is not protected from governmental immunity.

WHEREFORE, Plaintiff Prestigiacomo prays that this Court:

A.    Award Plaintiff and Overcharge Sub-Class members damages in excess of $600,000 or in an amount to be determined according to proof;

B.    Issue an order prohibiting the City from continuing its unlawful practice of overcharging motorists for expired meter fines;

C.    Grant an award of reasonable attorneys' fees and all expenses and costs of this action; and

D.    Order such other and further relief as this Court deems equitable, just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues that may be tried and decided by jury.

Respectfully submitted,

By: _____
Attorneys for Plaintiff

Patrick C. Dowd
Dowd & Dowd, Ltd.
227 West Monroe Street—Suite 2650
Chicago, Illinois 60606
Tel: (312) 704-4400
Fax: (312) 704-4500
patrickdowd@dowdanddowd.com

Edward X. Clinton, Jr.
The Clinton Law Firm
111 West Washington Street-Suite 1437
Chicago, Illinois 60602
Tel: (312) 357-1515
ed@clintonlaw.net